STATE OF IOWA, Appellee, v. ALICE RANDOLPH, Appellant.

**EVIDENCE:** Documentary—Foundation for Introduction. An incrimi-
1   nating letter is admissible against a defendant in a criminal prosecution when the statements thereof, when connected with other facts and circumstances *dehors* the letter, unerringly point to the defendant as the author, *even though there is no direct or expert testimony that defendant wrote the letter.*

**CRIMINAL LAW:** Evidence—Relevancy. Oral evidence of a plea of
2   guilty by a party other than defendant is admissible when it connects a series of interwoven transactions demonstrating that defendant and said other party were acting in conjunction in criminal operations.

*Appeal from Madison District Court.*—J. H. APPLEGATE, Judge.

NOVEMBER 22, 1921.

THE defendant was indicted under Paragraph 2 of Section 20 of Chapter 275, Acts of the Thirty-eighth General Assembly,

the indictment charging her, in substance, with the crime of having in her possession a motor vehicle with the serial number or engine number of said motor vehicle defaced, altered, or tampered with, and without having in her possession a certificate of registration and transfer from the proper officer, showing good and sufficient reason why said numbers were defaced, changed, or tampered with, and so on. The indictment charges that the motor vehicle in question was a Buick touring car K-45, 1921 model. The defendant pleaded not guilty, and trial was had to a jury. At the close of the State's evidence, and again at the close of all the evidence, defendant moved for a directed verdict, on the ground that the evidence was not sufficient to convict, and that there was no evidence to show that defendant had knowledge that the numbers were defaced or altered, if they were. The motions were overruled. The jury found defendant guilty, and sentence was pronounced. Defendant appeals.— *Affirmed.*

*John A. Guiher* and *W. S. Cooper,* for appellant.

*Ben J. Gibson,* Attorney General, and *Neil Garrett,* Assistant Attorney General, for appellee.

Preston, J.—It is shown without any substantial dispute in the evidence that defendant was in possession of the car, and that the numbers were changed, as charged. Indeed, counsel for

1. Evidence: documentary: foundation for introduction.

appellant state in argument that, for the purposes of this appeal, they do not contend that the jury was not justified in finding that the numbers were changed. We do not understand counsel to contend that defendant was not in possession; and there is no claim, as we understand it, that she had in her possession a certificate of registration and transfer from the proper officers, showing reasons why the numbers were defaced, etc. Defendant's counsel do contend, and such are the three errors assigned: First, that a certain letter, which the State alleges was written by the defendant, was erroneously admitted in evidence, without sufficient identification or foundation to show that it was a letter written by the defendant; second, that the court erred in per-

mitting the State to show that one Jim Sally, alias A. C. Collins, who, with this defendant, was charged with the offense of larceny of a Ford automobile, the numbers of which had been tampered with, had pleaded guilty to such charge; and third, that there was not sufficient evidence to warrant the jury in finding that defendant knew that the numbers on the Buick had been changed.

As to this last proposition, we may remark, in passing, that the instructions given by the trial court are not before us, so that we do not know whether the court instructed the jury that it was or was not necessary to show such knowledge. The statute does not seem to require it. It is contended by the State that it is not a necessary element to be negatived by the State. In the absence of the instructions, and for the further reason that we think that, under the evidence, the possession of defendant of such a car, so mutilated, was not innocent, and that the jury could have found that she did have knowledge, we deem it unnecessary to pass upon the question of law as to whether it is necessary to show knowledge.

1. The letter was admitted in evidence near the close of the State's evidence. At the close of all the evidence, defendant moved the court to strike the letter from the record and withdraw it from the jury, which motion was overruled. Mr. McKee, the sheriff, testified that he had seen the handwriting of defendant, and was acquainted with it to some extent; that the writing in the letter looked like the handwriting of defendant. But he afterwards testified that he had none of the defendant's handwriting in his possession; that he never saw her write anything; that he did not see her write the poem on the wall of the jail; that he saw some letters with the address on the envelope; that he never compared any of the envelopes with the writing on the wall. The defense contends that the mental comparison, as they put it, by the sheriff, of the writing in the letter with the writing on the jail wall, together with his evidence, was not sufficient to admit the letter in evidence.

The claim is that the letter in question was written while defendant was in jail at Atlantic, in Cass County, early in September. It is dated September 7, 1920. She was confined in the jail at Atlantic from September 3d to the 11th. So far, the

foundation or identification was, perhaps, not sufficient. But there are other circumstances shown, and the letter itself bears internal evidence of having been written by the defendant. It appears that someone had written a poem on the steel wall of the jail, with a lead pencil, while defendant was confined in the jail. Other people had been in the jail before defendant, but the sheriff says that the writing on the wall was not there then. The same poem was written in the letter. The letter is addressed to William Randolph, and is signed at the end, "Your wife." In the middle of the letter, when the party writing it evidently had stopped, and added more, it reads, "I remain, your wife, Alice By." She testifies as a witness on the stand that William Randolph is her husband. The letter refers to the separation of plaintiff and her husband, and refers to his having sent her away: She testifies as a witness that, after she got her husband out of jail at Carroll, he deserted her, and she felt hurt about it. In another place, she refers to the Carroll high ball, and says that she was not feeling well since then. The letter warns Randolph to be careful; that the Carroll sheriff is on the lookout for him; and again, "Once you get started, keep going, they are hip to the Carroll doings, and Waterloo, so you see that makes it harder on me." Again, "They found a file and one of your old bugs in the *Buick*." Again: "I look for another pinch from Winterset, as they have the *Buick* there, and understand they have warrants from there."

It appears that the car was in the possession of the sheriff at Winterset at that time. Defendant had been arrested for having the car in her possession at the town of Earlham, in Madison County.

Other matters of a personal nature, such as would be likely to pass between a husband and wife, and between this defendant and her husband, are referred to in the letter. The letter refers to matters which were known only to the defendant, and relates to subjects closely akin to the facts in this case, which facts were known only to the defendant, and which in themselves tend strongly to show that the letter was either written by her or dictated by her. Another circumstance in the letter not before mentioned is that it refers to a possible arrest in Madison County, Iowa, which arrest was not made until some time later. It is

contended by the State that, even though the court erred in admitting the letter in evidence, the ruling is without prejudice, because the essential elements in the offense charged are without dispute in the evidence; and that such elements are that defendant was in possession of the car, that the numbers were changed, and that she did not have the required certificate. There is another circumstance which seems to us important, and that is the fact that the defendant was a witness in her own behalf on the trial of this case, and did not deny writing the letter; did not, in her evidence, refer to the letter at all. She knew whether she wrote it, or at least authorized it, and knew that there was evidence tending to show that she did write it, and that the State was claiming that she did. Her silence is significant. Witness Campbell, a policeman at Marshalltown, testifies that he is acquainted with William Randolph, and that he got this letter from Randolph. One of the objections urged by defendant to the letter was that it was written after the transaction at Earlham, September 2d. But it was soon after, and relates to matters occurring prior thereto, in the nature of an admission. Considering all the evidence in the case, we think it was sufficient to permit the introduction of the letter in evidence as having been written by her, or perhaps dictated by her. The evidence shows that defendant's sister was in jail while defendant was confined therein.

2. Mr. McKee, the sheriff of Cass County, testifies that defendant was in jail at Atlantic, in that county, from September 3d until the 11th; that there was a person in the jail by the name of Jim Sally, at the same time; that he and defendant were brought there at the same time, charged with the same offense, to wit, the larceny of a Ford automobile, which was being driven by Sally at the time he and the defendant appeared together in Earlham, Madison County, she driving the Buick. After the sheriff had testified that defendant and Sally were charged with the same offense, the larceny of the Ford, witness was asked:

"Q. And to that offense did this Jim Sally plead guilty?"

Over objection, witness answered that Sally did; that witness saw the Ford automobile, and saw that the numbers had been fooled with. Witness Wright also testified, over objection,

2. CRIMINAL LAW: evidence: relevancy.

as to the appearance of the numbers on the Ford car; that, when
he raised the lid and looked at the number, there was fresh paint
on it; that the paint stuck to his fingers, and he got some waste
to wipe it off, and could see that it had been filed, and the
number recut.   This witness also testifies that defendant told
him that the person who accompanied her to Earlham was her
brother-in-law, by the name of A. C. Collins; that he drove the
car into Earlham, in Madison County.  This was on September
2, 1920.   It does not appear when defendant was arrested under
the charge herein, but the indictment was returned October 8,
1920.   The Buick car in question was stolen at Omaha, May 3,
1920.   The owner identifies it by marks on the car.  The marshal
of Earlham testifies that he saw defendant at Earlham on the
morning of September 2, 1920; that she told him she had driven
a Buick car into Earlham; that there was a man with her in
Earlham, who gave his name as A. C. Collins; that they brought
in a Buick and a Ford.   She said she got the Buick from her
husband; that they had separated, and she had gotten the car.
She said she had registered the car at Story City.  Mr. Wright,
the sheriff of Madison County, says he saw' defendant at Earl-
ham on September 2d.   She said she had driven into Earlham
in the Buick, which was then in Palmer's garage, and which the
sheriff later had in the barn.   He says further that defendant said
she had driven the car into Earlham from De Witt, Nebraska;
that she said she and Collins were going to Des Moines; that
she was driving the Buick.   The evidence tends to show that this
car was in possession of the defendant or her husband, and that,
a part of the time, they were in company with Jim Sally, in the
states of Minnesota, Wisconsin, Nebraska, and different points
in Iowa, within a few months prior to the arrest of defendant
and Sally (alias Collins), and after the car was stolen, May 3d.
Others than these three were doubtless acting together, stealing
and handling automobiles and aiding each other in that busi-
ness, for she says in her letter, before referred to:

"You and Tedd wants to be awful careful, as the Carroll
sheriff has notified all these little towns to look out for you;
there were five sheriffs and three deputies at Earlham.   It
looked like a coppers' reunion, so whatever you do be careful."

Defendant's letter itself refers to the fact that Sally pleaded

guilty,—just what the sheriff testified to, and of which defendant now complains.  The letter reads:

"I want to thank you and Teddy from the bottom of my heart for all favors rendered Jim and I.  poor Kid had to plead guilty to save me.  think we can get him paroled in six months * * * He was so anxious to help me get a bank roll so I could buy me a rooming house but it was not to be so. * * * Wanted Jim to go on, but he would not leave me.  we were in Omaha at 2 o'clock the same day you left. * * * Dell left for Kerney to raise more money and affidavits for Jim B of R is with her he has been here since monday he tried to buy the P. Q. off. from Jim but he woulden't cop. * * * I am certainly heartsick for Jim * * * court sets the 21st of this month but havent heard when *we* will be tried. * * * Jim is crazy over going up but he is game laughs and sings as though he is going to a picnic poor kid I got him away once and in trying to get me a lawyer he got grabed.  I would of gotten out of it all right if they hadnent of got him then they rapped to my monicker and the lice remembered Carroll so the Sheriff came down so I had to admit it so I think they are holding me now more to see if you turn up so you want to be careful more so now than ever before. * * * The P. A. here said I was the bail em out kid but once I got in the gang ducked.  they found a file and one of your old bugs in the Buick.  but I got all of Jims kit and thru them in an old doniker and two new licences some other louse chump will pay for all this by and by. * * * if Sis succeeds in raising the bonds I look for another pinch from Winterset as they have the Buick there and understand they have warrants from there. * * * I guess Alice Epos can stand it. * * * When I fall I will fall hard and with my boots on too."

It will be seen from all the circumstances detailed that the defendant and others—at least, she and Jim Sally—were closely associated in handling stolen cars and cars with changed numbers; that they appeared together with the two cars, one of which, the Buick, was a stolen car, with changed numbers; that she and Sally were charged with having stolen the Ford car, the numbers of which were also changed; that she knew that Sally had pleaded guilty to the larceny of the Ford car, with

which she also was charged, in order to save her. It may be that Sally's plea of guilty did save her on that charge. The record does not show whether she was tried for that, but it does show that she was not convicted of any charge in Cass County.

It is contended by the State that the plea of guilty by Sally to the offense of which they were both at that time charged is a connecting chain extending from the time the two parties arrived at Earlham until they were placed in jail in Atlantic, charged with the offense of stealing a Ford car, the numbers of which, as well as the numbers on the Buick car, had been changed; that the evidence was admissible in connecting Collins, alias Sally, and the defendant, to show the history of the entire transaction connected with the two automobiles. We are inclined to think that this is so. But however it may be, we think the error was without prejudice, because the defendant had herself, in her letter, stated the same thing, as testified to by the sheriff; and the evidence clearly shows, and concededly so, that defendant was in possession of the automobile in question in the mutilated condition, as charged in the indictment, and as condemned by the statute.

3. If it be necessary to show that defendant had knowledge that the numbers on the Buick car were changed, the evidence was sufficient to justify a finding by the jury, if the instructions required such a finding, that defendant's possession of the Buick car in question was not innocent, and that she did have knowledge. If the defendant, or the defendant with Collins, alias Sally, or they with others, as is evident from the record, were associated together in the business of handling stolen and mutilated cars, as was the case with the Buick at least, it would be but natural to change the numbers, to avoid detection; and it would be difficult, under such circumstances, for defendant to secure the certificate required by the statute, to show the reasons for such change of numbers. Some of the circumstances before referred to tend strongly to show that her possession of the Buick car, in the condition in which it was found, was not innocent. True, she testifies as a witness that she did not know, and that no one ever told her, that the numbers had been changed or tampered with; but there are other circumstances in the case, in addition to those before enumerated, tending to show knowledge.

The only witnesses testifying on behalf of the defense are the defendant and two witnesses from Fort Dodge. One of these two was the chief of police at Fort Dodge, and the other an attorney, who held the position of police judge at Fort Dodge. It appears from the evidence of the officers that William Randolph, defendant's husband, was arrested about August, 1920, when he had a Buick car in his possession; that he was not arrested on account of any offense connected with the Buick car, but on the charge of larceny of a Ford car in Carroll County. The Buick car was left in possession of the police department at Fort Dodge, when Randolph was arrested and taken away. Defendant came to Fort Dodge three or four times after the arrest of Randolph. After he had been taken to Carroll, she wanted the Buick car, and it was turned over to her on the 7th or 8th of August. Randolph claimed to own the Buick car, which was afterwards turned over to defendant by the chief of police.

"Defendant told me she had more money in the car than her husband. I did not tell Mrs. Randolph that the numbers on the car had been changed or tampered with; I told her it was my opinion they had been. Before I directed that the car be turned over to Mrs. Randolph, I got a report from the examination that the car was all right. I told her that the chief had been suspicious as to whether the car was all right, and he had a mechanic examine it, and that, in spite of the discrepancy and the serial number, one being 8 and the other 9, that the mechanic thought the car was all right. The chief asked me what he would do, and I advised him to let her take the car, after she had convinced me that she was Randolph's wife."

The defendant testifies that, after she got the car at Fort Dodge, she drove it home to De Witt, Nebraska, and had it in her possession until it was taken again at Earlham. It appears, then, without question that the car turned over to defendant at Fort Dodge in August was the same car which she had at Earlham about September 2d. Before the last named date, she had been told by the attorney that, in his opinion, the numbers had been changed, and that the chief of police was suspicious about it; and it appears that there was, in fact, some question about the figures 8 and 9. These circumstances would clearly tend to show knowledge on her part, although it is true that she suc-

ceeded in obtaining the car. On the other hand, if the numbers had been changed when defendant received the car at Fort Dodge, they were changed, and the evidence clearly so shows, and it is conceded, when it arrived at Earlham, September 2d. She was in possession of the car from the time it was turned over to her at Fort Dodge up to the time she appeared at Earlham; and if the numbers were changed after she left Fort Dodge with it, they were changed while the car was in her possession. Defendant also testifies that she first saw this car in Minneapolis; that her husband had it; that he took it to Elroy, Wisconsin, and that she went with him; that she was in Minneapolis about nine weeks; that she stayed in Wisconsin about three days, and they went to Story City; that she stayed at Story City about three days; that she had the car registered in Iowa while there.

"I registered it. Mr. Randolph registered the car in Wisconsin. We had a misunderstanding at Clear Lake, when I went home, and the next time I saw the car was at Fort Dodge."

She says further that she was called to Carroll, Iowa, by her husband to help him, which she did by furnishing him money for bail.

It is contended by the State that her explanation of her possession of the Buick car and of the various registrations is inconsistent and unsatisfactory. Another circumstance relied upon is that defendant told the sheriff that the Buick car had been purchased from McCarty, about May 1, 1920. She produced a bill of sale from McCarty to William Randolph, of Madison, Wisconsin, dated May 1, 1920. It does not appear to have been acknowledged or recorded. At the end of the bill is the following: "Attest: F. R. Gosney, Notary Public. (Seal.)" The bill of sale is somewhat out of the ordinary, and may have been secured for purposes of the defense, as the two new licenses which defendant says in her letter she secured, when she says, "I got all of Jim's kit and threw them in an old doniker and two new licenses." But the significant fact about the bill of sale dated May 1st is that this was before the Buick car in question was stolen at Omaha on May 3d, as testified to by the State's witnesses, and it is without dispute. Another circumstance relied upon by the State is that the defendant had the car registered in Story County, Iowa, in her own name; whereas it had been

but a short time previously registered in the name of her husband. But as to this, it is not quite clear that she did have it registered in Story County in her own name. We have heretofore set out the evidence as it is. She says, "I had it registered." It appears in the testimony of one of the State's witnesses that defendant told him that the car had been registered in Madison, Wisconsin, May 5, 1920. This was two days after it was stolen at Omaha.

Without further discussion, we think there is no prejudicial error, and the judgment is, therefore,—*Affirmed.*

EVANS, C. J., WEAVER and DE GRAFF, JJ., concur.